# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

DAVID S. DURAN,

       Plaintiff,

v.                                        CIV No. 01-109 MV/LFG

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

       Defendant.

## **MAGISTRATE JUDGE'S ANALYSIS AND RECOMMENDED DISPOSITION**[1]

Plaintiff David S. Duran ("Duran") invokes this Court's jurisdiction under 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner determined that Duran was not eligible for supplemental security income ("SSI") or disability insurance benefits ("DIB"). Duran moves this Court for an order reversing the Commissioner's final decision and remanding for a rehearing. [Doc. 10.]

### **Procedural History**

The procedural history of Duran's applications for benefits is complex. This matter was remanded once by the Appeals Council and remanded a second time by agreement of counsel, thus,

---

[1]Within ten (10) days after a party is served with a copy of these findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such findings and recommendations. A party must file any objections with the Clerk of the U.S. District Court within the ten-day period allowed if that party wants to have appellate review of the findings and recommendations. If no objections are filed, no appellate review will be allowed.

resulting in three separate administrative hearings and the issuance of three different decisions by the same Administrative Law Judge ("ALJ"), William F. Nail. In addition, during the pendency of his appeal of the second ALJ decision on his application for DIB benefits, Duran filed a new application for SSI. Subsequent to this second application, counsel agreed to remand the first matter. In his third decision, ALJ Nail resolved both the remand related to DIB benefits and the second application for SSI.

Duran was born on April 19, 1952, is divorced and has three children. He currently appears to be living in homeless shelters. He was 47 years old when the third and last administrative hearing was held. He has a tenth grade education and was previously employed as a crane operator, landscaper/yard man, laborer, and stocker. Much of his prior work activities appear to have been sporadic and short.[2]

On January 24, 1994, Duran submitted his first application for DIB, claiming an onset date of August 7, 1993, when he fell at work and suffered a cerebral concussion, basal skull fracture and left temporal bone fracture. [Tr. at 17, 46.] Duran alleged that he was unable to work because of his head fracture, hearing loss in his left ear, memory loss, low back pain, right leg pain, numbness, dizziness, headaches and blurred vision. [Tr. at 63.] After his work place injury in August 1993, Duran's diagnoses included organic mental disorders, depression and personality disorders. [Tr. at 58.] He also had a history of significant alcohol abuse and psychological problems prior to his head

---

[2]In addition, there is some confusion in the record as to the extent of Duran's employment record in more recent years, although this confusion does not appear to be material to the issues before the Court. [*See* Tr. at 676.] The Appeals Council concluded that Duran's updated earnings showed that he performed substantial gainful activity from 1996-1999, thereby impacting his credibility. Duran's attorney asserts, however, that some of the employment reflected on his earnings record should not be attributed to him. [Tr. at 910, 920.]

injury.  [Tr. at 265.]  His lengthy and complex medical history[3], along with his tendency to exaggerate medical symptoms, failure to be forthcoming and non-compliant with medical treatment have greatly complicated his medical diagnoses, as well as the pertinent determinations to be made by the Court.

With respect to Duran's first application for benefits, an administrative hearing was held on November 10, 1994.[4]  [Tr. at 623.]  In a decision, dated February 22, 1995, Judge Nail found that Duran was not eligible for benefits.  Judge Nail concluded that Duran had the residual functional capacity to perform sedentary, light or medium work, notwithstanding his intelligence level that was considered borderline to average low.  Duran requested a review by the Appeals Council, and on February 23, 1996, the case was remanded for rehearing with specific directions for the ALJ to obtain updated medical records, reconsider Duran's residual functional capacity, obtain evidence from a medical expert so as to clarify Duran's mental impairment and obtain supplemental evidence from a vocational expert, if warranted.  [Tr. at 330.]

On August 29, 1996, Judge Nail conducted a second administrative hearing.  [Tr. at 659.] Consistent with instructions from the Appeals Council, Dr. Balcazar, a psychiatrist, examined Duran, additional medical records were reviewed, and further evidence was presented regarding Duran's psychiatric care.  A vocational expert also testified. On April 23, 1997, Judge Nail issued a well reasoned 21-page decision denying Duran benefits.  [Tr. at 16.]  In summary, Judge Nail found that Duran could work, if he was not drinking.  [Tr. at 26.]  Judge Nail concluded that, in considering Duran's coronary artery disease and hypertension, organic brain syndrome, polysubstance abuse, and

---

[3]The administrative record includes almost 1000 pages of materials, many of which are medical records and reports.

[4]Duran's application for benefits was denied at the initial and reconsideration stages, and he sought timely review from an ALJ.

depression solely or in combination with his non-severe impairments, Duran could still perform sedentary work. However, the ALJ reasoned that it was unlikely, based on objective medical evidence and Duran's history, that Duran would cease drinking. Therefore, Judge Nail found that drug addiction and alcoholism were contributing factors material to the determination of disability and concluded Duran was ineligible for DIB. [Tr. at 34.]

The Appeals Council declined Duran's request for review of the second ALJ decision. Duran then appealed to the federal district court. While the appeal was pending, the Commissioner agreed to remand. [Tr. at 764.] In the Court's Order of remand, the ALJ was instructed to update the medical record, "give the claimant the opportunity to testify . . . with ME [medical expert] testimony to assist the ALJ in considering [Duran's] mental impairment from a longitudinal perspective," use a vocational expert as needed, evaluate Duran's "impairments separately to determine what limitations would remain if the claimant has stopped using drugs and alcohol and whether these limitations would be disabling," consider pain under the 10th Circuit standard, and relate the credibility determinations to the evidence. [Tr. at 764-65.]

On December 14, 1999, Judge Nail conducted a third administrative hearing. Duran was present and testified. Both medical and vocational experts testified. In a decision dated February 8, 2000, the ALJ denied Duran's request for DIB and SSI. [Tr. at 700.] Judge Nail concluded that while Duran's intellectual functioning was at a borderline level, this level did not prevent Duran from performing unskilled work that did not involve complex or detailed job instructions. [Tr. at 704.] The ALJ specifically found that Duran was disabled when he was actively abusing alcohol but that without the consideration of his alcohol abuse, Duran retained the RFC to do unskilled, routine tasks. [Tr. at 706.]

Duran challenged this determination to the Appeals Council which denied his request for review on January 2, 2001. [Tr. at 676-77.] This appeal followed.

## Standards for Determining Disability

In determining disability, the Commissioner applies a five-step sequential evaluation process.[5] The burden rests upon the claimant to prove disability throughout the first four steps of this process, and if the claimant is successful in sustaining his burden at each step, the burden then shifts to the Commissioner at step five. If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[6]

Briefly, the steps are: at step one, claimant must prove she is not currently engaged in substantial gainful activity;[7] at step two, the claimant must prove his impairment is "severe" in that it "significantly limits his physical or mental ability to do basic work activities . . . .,"[8] at step three, the Commissioner must conclude the claimant is disabled if she proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (1999);[9] and, at step four, the claimant bears the burden of proving he is incapable of meeting the physical and mental demands of his past relevant work.[10] If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering

[5]20 C.F.R. § 404.1520(a)-(f) (1999); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

[6]20 C.F.R. § 404.1520(a)-(f) (1999); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

[7]20 C.F.R. § 404.1520(b) (1999).

[8]20 C.F.R. § 404.1520(c) (1999).

[9]20 C.F.R. § 404.1520(d) (1999). If a claimant's impairment meets certain criteria, that means his impairment is "severe enough to prevent him from doing any gainful activity." 20 C.F.R. § 416.925 (1999).

[10]20 C.F.R. § 404.1520(e) (1999).

claimant's RFC,[11] age, education and past work experience, he is capable of performing other work.[12] If the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove he cannot, in fact, perform that work.[13]

## Standard of Review and Allegations of Error

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards. Glenn v. Shalala, 21 F.3d 983, 984 (10th Cir. 1994). To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance. Trimiar v. Sullivan, 966 F.2d 1326, 1329 (10th Cir. 1992); Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991). The Court's review of the Commissioner's determination is limited. Hamilton v. Secretary of Health & Human Servs., 961 F.2d 1495, 1497 (10th Cir. 1992). The Court's function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision and whether the correct legal standards were applied. Id. at 1497-98. In Clifton v. Chater, the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the
> evidence, but an ALJ is not required to discuss every piece of
> evidence. Rather, in addition to discussing the evidence supporting
> his decision, the ALJ must discuss the uncontroverted evidence he

---

[11]One's RFC is "what you can still do despite your limitations." 20 C.F.R. § 404.1545(a). The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy. Those categories are: sedentary, light, medium, heavy and very heavy. 20 C.F.R. § 405.1567 (1999).

[12]20 C.F.R. § 404.1520(f) (1999).

[13]Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

> chooses not to rely upon, as well as the significantly probative evidence he rejects.

Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted).  If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed.  The Court cannot re-weigh the evidence or substitute its judgment for that of the Commissioner.  Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).

Judge Nail carefully followed the instructions in the remand Order by considering testimony from a medical expert on Duran's mental condition, testimony by another vocational expert, testimony by Duran, and evidence regarding Duran's impairments.  Judge Nail also considered whether any limitations on Duran's functioning would remain if he stopped abusing alcohol.  [Tr. at 700.]  After thoroughly reviewing the medical records and the above mentioned testimony, the ALJ concluded that Duran was not disabled under the standards of the Social Security Act.  [Tr. at 707.]

In reaching this decision, Judge Nail's findings in his February 8, 2000 opinion include the following:  (1) Duran did not engage in substantial gainful activity during the pertinent time frame; (2) Duran's impairments or combination of impairments (including residual effects of right coronary artery thrombosis and myocardial infarction with associated anoxic encephalopathy, status-post angioplasty and placement of right coronary stent, residual effects of a closed head injury, a seizure disorder, organic brain syndrome, depression, and borderline intellectual functioning) did not meet or equal any of those in the Listing of Impairments; (4) Duran's testimony and reports of symptoms and functional difficulties were not supported by the evidence overall and lacked credibility; (5) Duran retained a RFC to perform unskilled sedentary and light work activities and his intellectual functioning did not prevent him from performing unskilled work not involving complex or detailed job instructions; (6) there were jobs available both nationally and regionally that did not involve detailed

7

or complex instructions that he could perform; and (7) Duran was not under a disability, as defined by the Social Security Act, at any time through the date of the February 8 decision. (Tr. at 700-07.)

In this appeal, Duran asserts that the case must be reversed and remanded on the following grounds: (1) the ALJ erred in his step three finding that Duran's condition did not meet or equal a Listing; (2) the credibility determinations were not supported by substantial evidence and were contrary to law; (3) the ALJ failed to consider whether Duran was entitled to a closed period of disability; and (4) it was error for Judge Nail to have heard Duran's case for a third time. [Doc. 11.] The Commissioner argues that the ALJ's decision should be affirmed because substantial evidence supports the ALJ's decision and because the decision is a correct application of the regulations. [Doc. 12.]

After a review of the entire record, this Court finds that the ALJ's decision was supported by substantial evidence, and that there is no error in that decision. Therefore, Duran's motion to reverse and remand will be denied.

### Summary of Duran's Medical Conditions and Treatment

Duran began drinking when he was about 18. [Tr. at 24.] At least some of Duran's 1980's medical records were provided and reviewed and they confirm an early drinking problem. A 1985 record notes that Duran had a clinical history of alcoholism and that he was being treated with Antabuse. [Tr. at 396.] In 1988, he allegedly was depressed about his drinking problem and threatened to jump off a ledge in the Sandia Mountains. [Tr. at 389-90.] In 1989, a medical record documenting a gunshot wound he suffered to his left lower leg, also indicates that he had a habit of drinking 3 six-packs of beer per weekend and two six-packs per day. [Tr. at 332.]

In 1989, he apparently hit "rock bottom" due to his drinking problem and after getting out of jail, was admitted to Turquoise Lodge for treatment. The records show that he had been drinking for twenty years at that point. [Tr. at 296, 303.] In June 1992, he attempted suicide by taking an overdose of tylenol elixir with codeine and antibiotics prescribed for pneumonia. [Tr. at 374-75.] He drank about a six pack of beer that day as well. [Tr. at 370.]

On August 7, 1993, the alleged onset of his disability (for his first application for DIB), Duran fell at work while moving a sheet of glass and struck his head on the pavement. His head was fractured, and he suffered a cerebral concussion. [Tr. at 17.] Upon admission to the hospital, his girlfriend described him as a "social drinker." [Tr. at 130.] He promptly improved over 24 hours and stabilized but then appeared disoriented. [Tr. at 105.] He was placed in a Brain Injury Treatment Program and had a good prognosis. [Tr. at 186.] In early September 1993, Duran was admitted for rehabilitation at St. Joseph's Hospital. His medical records document acute decompensation in his speech output and impulsiveness. He tried to walk out of the hospital several times. He began having fluctuating levels of consciousness and slurred speech which progressed to the inability to speak at all. He was transferred back to the main hospital until he stabilized again. [Tr. at 132-33.]

Some of Duran's medical records at this point indicate significant and severe behavioral issues. Duran was provided rehabilitative therapy, including physical, occupational and recreational therapy, daily nursing, speech therapy, neuro-cognitive care and an evaluation. He had an abnormal EEG, that was consistent with a generalized cerebral disturbance. [Tr. at 153, 17, 150.]

On September 14, 1993, he was discharged. The discharge summary reflects a traumatic brain injury and cognitive impairments. He was treated with Lithium and Dilantin and advised about the dangers of using alcohol with these medications. He was not able to return to work then because of

his difficulties with balance. [Tr. at 147-49.] He continued receiving therapy through September and October. Records from that time frame show that his immediate memory was profoundly impaired, recent memory moderately impaired, and remote memory severely impaired. He was able to maintain attention for a full session of speech therapy. [Tr. at 177, 184.] He had range of motion for all extremities was normal and his strength was within normal limits. [Tr. at 18, 174.] He was exhibiting a short temper and having difficulties with his girlfriend. [Tr. at 156.] A psychologist discussed the impact of alcohol and drugs on a traumatic brain injury, but Duran denied any current problem with alcohol or drug abuse. [Tr. at 182.]

Although he continued to attend various therapy sessions, he failed to show up on a number of occasions. [Tr. at 165, 164, 158, 172.] In October, his workers' compensation case manager asked that he be discharged early from therapy. Duran stated that he wanted to return to work. [Tr. at 169.]

Surgery was performed on his left external auditory canal at the end of October. [Tr. at 187, 208.] In early November 1993, Duran was readmitted to HealthSouth complaining of headaches, dizziness, memory problems, weakness, impulsivity, mood swings and hallucinations. The visual hallucinations resolved within two to three days at the hospital which were thought to have resulted from overuse of narcotics. He left the hospital against medical advice. [Tr. at 191, 266.] He was scheduled for an outpatient appointment with Dr. Ewing (psychiatrist) but did not keep that appointment. [Tr. at 191.] On November 13, 1993, Duran visited Presbyterian Hospital complaining of headaches. He was seen wandering around the hospital looking for ride. He was told to stay at the hospital but was seen leaving. [Tr. at 199.]

On November 18, 1993, Duran was admitted to Charter Hospital the day after an attempted suicide. Duran overdosed on antibiotics and nonsteroidal drugs. He apparently drank four or five beers prior to his suicide attempt. [Tr. at 191.] Dr. Ewing described Duran as making "cloying, ingratiating interpersonal contact" and not being forthcoming. Dr. Ewing gave him a mini-mental status examination, and noted that "he performed very well indeed." Duran was worried about being in a psychiatric hospital but claimed he no longer felt "in a fog" or unable to cope. He maintained that his memory was disturbed for as long as 25 years prior to the August 1993 accident. Dr. Ewing thought this statement might have been an exaggeration based on information Duran was able to give to him. Dr. Ewing prescribed Paxil for depression and hospitalized Duran for his own safety. Duran's diagnosis included organic affective syndrome, status post closed head injury, and psychosocial stressors. He was given a GAF of 40 while a GAF of 85 was the highest he attained in the past year. [Tr. at 193.]

Duran later denied having attempted suicide and stated he was just trying to cure a headache with eardrops. He said he was entirely recovered and wanted a discharge. He apparently lied to Dr. Ewing to try to get discharged by inventing a story about his son being hurt. Dr. Ewing spoke to Duran's girlfriend at that point who told Dr. Ewing that Duran had been lying to get his way for a long time before his head injury and that she was not surprised by this behavior. Dr. Ewing told Duran that his case manager had warned that Duran's insurance might be discontinued due to his repeated non-compliance both in leaving hospitals against medical advice and in improperly using medications. [Tr. at 294.] Notwithstanding this warning, Duran's girlfriend supported his leaving Charter. On November 24, 1993, he was discharged against medical advice. Dr. Ewing believed that

many of Duran's behaviors, at this point, represented premorbid (pre-accident) personality functioning rather than resulting changes due to the injury. [Tr. at 293.]

On December 7, 1993, Duran was readmitted to Charter, asking for help. He said that he attempted suicide two times that day and that his girlfriend had left him. Then he recanted, denied the suicide attempts and said his girlfriend had not left him. Duran apparently was having difficulties with his girlfriend at this time who did leave him in late 1993. Dr. Ewing recorded that Duran was ingratiating, unctuously cooperative, and demonstrated a superficial personal style. Dr. Ewing documented that Duran had organic affective disorder and sociopathic personality disorder. [Tr. at 216.] Dr. Ewing told Duran that before he could be helped, Duran needed to be frank and to stop telling "fantastic stories" that did not check out. Dr. Ewing found him to be manipulative and believed it was likely that Duran had a life long character disorder. [Tr. at 216.] Dr. Ewing asked Duran to leave the hospital.

In early 1994, Duran presented to HealthSouth complaining of low back pain with numbness and loss of sensation in his right lower extremity. His prior lack of compliance with medical treatment was discussed with him and his sister who was present. His sister reassured medical providers that he would be compliant. He was placed back in the brain injury rehabilitation program. [Tr. at 255.] On January 22, 1994, a UNMH record indicates that he was feeling depressed since his girlfriend left and that he wanted to show her how upset he was by taking large amounts of pain pills. He overdosed on medications in a suicide gesture or attempt on about January 22. [Tr. at 367.]

On January 24, 1994, Dr. Ewing again saw Duran and reported that Duran's fabrications were too implausible and too great to have resulted from his sociopathic diagnosis. Duran appeared grief stricken about his girlfriend leaving and apparently was stalking her. He admitted to Dr. Ewing that

he had told many lies about people and he resolved never to lie again. Contrary to his girlfriend's prior reports, family members stated that Duran did not have these symptoms of lying before his closed head injury. [Tr. at 262.] The January 24 medical record documents Dr. Ewing's embarrassment at having told Duran to leave the hospital on December 7. Dr. Ewing states that he needs to revise his opinion but he is not clear what diagnosis to give Duran or whether it has any relation to his head injury. [Tr. at 262.]

On this same day, Duran signed his first application for DIB. [Tr. at 46.] Duran filled out the daily activities questionnaire, stating that he tired easily and was forgetful, but had no difficulties getting along with people. He liked building model cars. [Tr. at 90.] On January 26, 1994, Dr. Reeve saw Duran and reported that Duran was "well known to his service," having complained of low back pain during his last visit to Dr. Reeve at HealthSouth. Duran had a normal EMG and normal nerve conduction study with some loss in amplitude. [Tr. at 253.]

It appears that Duran was discharged from the HealthSouth rehab program on about February 14, 1994 after not appearing for several therapy sessions earlier that month. [Tr. 223.] On February 23, 1994, Dr. Ewing noted another episode of "outrageous lying" by Duran, who complained that his sister was growing marijuana in her basement, although the sister's house did not have a basement. His sister stated that Duran was unable to do anything around the house at this time. [Tr. at 260.] On February 28, 1994, Dr. Reeve reported that Duran could return to light work with no lifting over 20 pounds, with distant supervision, no elevated surfaces, etc. [Tr. at 220.]

On April 4, 1994, Dr. Haaland, Ph.D., performed a neuropsychological examination on Duran and reported a significant alcohol history for about 7 years, weekend binging, and 6 DWI's. [Tr. at 265.] His sister reported that he had not used alcohol since he began living with her in November

1993. During testing, Duran responded easily to questions, was very cooperative, kept his attention, and followed directions easily. Dr. Haaland indicated that Duran had a tendency to exaggerate current symptoms perhaps to get help and attention, and the doctor's record also notes that Duran had a significant psychiatric history even before the August 1993 accident. Dr. Haaland stated that the test results, with Duran's history of significant alcohol abuse and psychiatric problems preceding the accident, made it difficult to identify subtle deficits associated with his injury. [Tr. at 269.] Contrary to what the family reported about Duran's capabilities at home, it appeared to Dr. Haaland that Duran could work in a routine structured job. [Tr. at 269.]

On April 20, 1994, Dr. Romanik conducted a psychiatric review and completed a mental RFC. [Tr. at 49, 58.] He noted organic mental disorders, personality disorders, substance addiction disorders, and antisocial, intense and unstable interpersonal relations. Dr. Romanik apparently summarized some of the records of Duran's prior treatment and testing. For example, he stated that Duran worked well with few breaks over a six hour test period and followed instructions easily. Duran's testing suggested that his ability and potential greatly exceeded his behavior at home. In addition, his MMPI suggested that his behavior might be exaggerated. Dr. Romanik believed that by August 1994 ("if not now"), Duran should have the ability to handle routine work in a relatively structured setting. [Tr. at 60.]

On May 4, 1994, Dr. Ewing notes that Duran missed his appointment the preceding day. Both Duran and his sister were frustrated with Duran's capabilities. Dr. Ewing was hesitant to prescribe Duran with certain anti-depressants due to Duran's prior abuse of medications and his prior suicide attempt. Dr. Ewing also notes that Duran presented an exasperating and very difficult case. Duran had symptoms to qualify for a diagnosis of major depression but a long history of similar

difficulties, including substance abuse and the head injury. Duran denied using alcohol in a "good long while," which his sister corroborated. [Tr. at 282.]

In June, Duran canceled additional appointments with Dr. Ewing. [Tr. at 282.] From the September 24, 1994 record it appeared that he was drinking while taking Dilantin and was complaining of seizure problems. [Tr. at 412.] Doctors theorized that alcohol withdrawal was playing a role in the seizures. Duran stated that he had stopped drinking as of August 1993, and that he had gone as long as one month without using alcohol at all. However, his last drink was the preceding Wednesday when he had 3-4 beers. [Tr. at 432.]

At the first administrative hearing on November 10, 1994, Duran stated that he had experienced black outs 8-9 times, was dizzy at times and had hallucinations, but that he could do his own laundry, read the Bible every morning, pulled weeds, raked and mowed lawns to buy cigarettes, went to Church, and went to Old Town to meet people. [Tr. at 623.]

On February 22, 1995, Judge Nail issued his first decision denying Duran DIB benefits. [Tr. at 306.] He concluded that Duran had not met his burden of establishing that he had any mental impairment that caused more than a minimal effect on his ability to work. Judge Nail further found that Duran had a RFC to perform at least medium work, he was able to perform his past relevant work during the period under review and that vocational expert testimony confirmed there were jobs he could perform. [Tr. at 320.]

On February 27, 1995, Duran apparently suffered a prolonged seizure. [Tr. at 509.] He also was having some cardiac problems in early 1995. On about March 1, 1995, Dr. Fotieo performed a cardiac catheterization. [Tr. at 446.] The March 2, 1995 record reflects seizure disorder, EKG changes and coronary artery disease. [Tr. at 445.] This record documents "occasional" alcohol use

with a history of abuse in the past. On the same day his EEG was abnormal although an epileptic tendency was suggested. The physician advised clinical correlation. [Tr. at 509.]

On March 22, 1995, Dr. Owen, Ph.D. examined Duran, at Duran's attorney's request. [Tr. at 459.] Dr. Owen reported that Duran had a 79 verbal IQ, 80 performance IQ and 79 full scale IQ. Duran claimed no alcohol consumption for 5-6 months. Dr. Owen commented that the MMPI could not be used perhaps because of an "attempt to feign mental illness." [Tr. at 460.] Duran's emotional and social functioning were closely connected to the use of alcohol. During a period of drinking, Duran's ability to function was limited, whether he intoxicated then or between times of intoxication. Duran apparently told Dr. Owen that his girlfriend also had abused alcohol. Dr. Owen found that Duran's memory, insight and judgment were limited due to his level of cognitive functioning and the adverse impact of alcohol abuse. Duran had the attention necessary to complete simple, repetitive tasks. Dr. Owen questioned whether Duran could effectively deal with the stresses associated with day-to-day work. [Tr. at 461.]

On June 14, 1995, Dr. Owen completed a medical assessment of Duran's ability to work. Duran was rated "fair" in all categories except "functions independently," where he was rated "poor or none." [Tr. at 463.] Dr. Owen wrote that Duran had general limitations due to cognitive functioning that was low average to high borderline. Duran's history of alcohol abuse aggravated his ability to function and clouded the picture in terms of assessing motivation and depression. Duran could not cope with stress associated with day-to-day work very well. Duran was capable of managing own benefits contingent upon his use or abuse of alcohol and his emotional distress at the time. He "is certainly capable of understanding and carrying out simple job instructions." [Tr. at 462-65.]

On February 19, 1996, Duran presented at UNMH stating he wanted to die and had suicide ideation for three months since his son died. He admitted taking shots of vodka that morning, but explained that his alcohol intake was in moderation. [Tr. at 498-99.] There is no confirmation in any of the records that his son died.

After remand by the Appeals Council on February 23, 1996, Duran was examined by Dr. Balcazar (psychiatrist). Dr. Balcazar notes that Duran started drinking at the age of 18 and that his last of many DWI's was in 1992. His driver's license was revoked for five years. About three months prior to this date, Duran stated he had started going to AA and was sober since then. Duran told Dr. Balcazar that he had been having seizures for one year, the "grand mal" type. His last seizure was three months prior to February 23. Dr. Balcazar noted that Duran had low to average intelligence or upper borderline level. He doubted that Duran had adequate judgment to plan a work sequence but stated that Duran could use tools and material for simple jobs and perform one or two step repetitive tasks at a competitive rate. Dr. Balcazar also stated that Duran's main handicap was of a physical nature, including pressure in his head, lightheadedness or seizures. He did not believe Duran would have difficulty with co-workers or supervisors and found that Duran could handle his own funds without supervision. [Tr. at 466-69.]

In mid-1996, Duran complained of chest pain and related problems. [Tr. at 482, 486, 523, 478, 514-15, 521.] He apparently was drinking again in July or August 1996 and was mixing alcohol with Antabuse. [Tr. at 22, 526, 559.] He was unable to attend the second administrative hearing because he was hospitalized with an acute reaction to mixing alcohol and Antabuse, a drug used to treat alcoholism. [Tr. at 559.] Dr. Mertz's August 30, 1996 record shows that Duran had left sided

pain in his chest after Antabuse reaction secondary to drinking that afternoon after he had taken Antabuse. Duran admitted that by noon that day he had had five beers. [Tr. at 559.]

At the second administrative hearing on August 29, 1996, Duran's attorney waived Duran's appearance. His attorney later wrote to ALJ Nail explaining that Duran was not present for the hearing because he was at UNMH for "heart problems." [Tr. at 531.] At the hearing, additional evidence was discussed regarding Duran's psychiatric care and Dr. Balcazar's examination. A vocational expert testified and found that Duran could do some light and sedentary level work. However, if alcohol were added into the equation, all jobs would be eliminated. [Tr. at 671.]

On April 23, 1997, Judge Nail issued his second decision. His opinion included the finding that Duran had a severe mental impairment. [Tr. at 23-24.] He also found that Duran had a multitude of health problems that all were alcohol related. If Duran was not drinking he did not have seizures and could maintain his attention span. However, Judge Nail found it was unlikely that Duran could perform any ordinary occupation with his pattern of drug and alcohol abuse. Judge Nail discussed the vocational expert's testimony that Duran could perform other work if he did not abuse drugs and alcohol. [Tr. at 31-33.] The ALJ concluded that Duran would not be disabled if he stopped using drugs and alcohol. He had no physical impairments that would limit his performance below sedentary work. Duran was found ineligible for DIB due to drug and alcohol abuse. [Tr. at 34.]

In September 1997, Duran presented to UNMH complaining that he wanted to stop drinking, that his drinking was out of control and that he had suicidal thoughts. [Tr. at 815.]

In May 1998, he apparently suffered a heart attack and was admitted to UNMH. [Tr. at 823.] The medical record notes a long history of alcohol abuse and that Duran suffered from active alcohol

withdrawal while in Medical Intensive Care. Duran showed a marked improvement in his mental status over his last four days of hospitalization. [Tr. at 823.] In June 1998, Duran was admitted to a rehab center in Roswell. He told the medical staff that he drank heavily until about eight months ago. He was attending AA meetings as of that date and had stopped drinking. He also told the staff that he was working part-time at a shelter cooking. [Tr. at 873.] On June 16, 1998, he filed a new application for SSI benefits, while his first application for DIB was pending. He claimed an onset date for the second application of May 18, 1998 when he suffered a heart attack. [Tr. at 774.] The disability report filled out by Duran indicates his disabling conditions were cardiac arrest, cognitive impairment, severe deficits in memory, attention and recall and endurance. [Tr. at 791.]

On June 19, 1998, he was discharged to a Chemical Dependency Unit for treatment. [Tr. at 850.] On October 7, 1998, there is a report of contact by social security with Duran that states Duran had not seen a doctor since he left rehab, he was speaking clearly and said he had no heart problems. He told the interviewer that he got light headed which kept him from working. [Tr. at 807.]

On October 30, 1998, the first application for DIB, that had been appealed to the federal district court, was remanded upon consent by the Commissioner. [Tr. at 764.] On February 18, 1999, Dr. Kreuch (psychologist) conducted a neuropsychological evaluation. Duran told Dr. Kreuch that he had stopped drinking about two years ago, even though Kreuch noted that the records from rehab showed otherwise. This record documents that Duran had 7 DWI arrests, the last one in 1989. His verbal IQ was 70, his performance IQ was 73, and his full scale IQ was 69. Dr. Kreuch found that a better estimate of his current functioning was a performance IQ of 73. This placed him in a borderline range of intellectual functioning. [Tr. at 879.] His diminished cognitive and intellectual functioning could be related to a combination of factors, including encephalopathy, alcohol abuse

and/or the head injury. He displayed adequate memory functioning and had a GAF of 50. His depression in 1994 apparently had not recurred. Dr. Kreuch thought Duran might be a good candidate to participate in a vocational rehab program but that it appeared he would need some type of assistance on a temporary basis if he was going to return to meaningful work activity. [Tr. at 877.]

On March 15, 1999, Dr. Chang conducted a mental RFC and found Duran was capable of working with basic instructions. [Tr. at 893.] On March 17, 1999, N. Nickersams performed a physical RFC and concluded that Duran had fully recovered from the heart attack and had no residual motor weakness or aphasia. [Tr. at 895.]

On December 14, 1999, Judge Nail held the third administrative hearing, in relation to both the remand for DIB benefits and the more recent application for SSI benefits. [Tr. at 714.] Duran apparently had held some short-term positions in recent years, including construction clean up for several months and work at the State Fair. He testified that he could not work due to light headedness and hearing voices but stated he had no other problems. [Tr. at 725.] He admitted he had never been treated for hearing voices, nor seen a doctor for this complaint. He stated that he went to AA meetings every day and NA meetings every other day. He went to the movies, out to eat, and spent about ten hours a day drawing. He could sweep and clean, and take care of his personal needs. He could sit for an hour and a half and/or stand 3-4 hours. He could walk two miles and lift 20 pounds. He was able to bend, kneel and squat. He denied using alcohol or drugs. [Tr. at 734.]

Dr. William Hunter, a medical expert, testified at the hearing. He concluded that Duran did not meet any of the Listings. Neither his prior seizure problem nor his depression were currently issues. His cardiac status was resolved. [Tr. at 742.] Dr. Hunter found that Duran could handle

relatively uncomplicated repetitive tasks with some supervision. However, his consumption of alcohol would disable him from working. If he drank, he might even meet a Listing. Dr. Hunter also noted that drinking would adversely affect Duran's IQ. Dr. Hunter agreed that Duran would have met a Listing "right after" the 1993 accident because Duran was unconscious for a short time. He explained that it was difficult to sort out more than a year prior to this hearing date whether Duran met a Listing because it depended on his alcohol use. [Tr. at 752.]

A vocational expert again testified at this hearing. She concluded that there were jobs available in the national and regional economies that Duran could perform. [Tr. at 756-58.] In the third decision, Judge Nail denied an award of DIB or SSI benefits to Duran. [Tr. at 700.]

## Discussion

### A.    *Listing of Impairments*

Duran asserts that the ALJ erroneously failed to analyze this case under Listing 12.02 "Organic Mental Disorder," and that the medical expert offered no opinion whether Duran met or equaled a Listing under 12.02. [Doc. 11 at 6, 7.] Duran also argues that his skull fracture in 1993, his hospitalization and treatment for psychiatric problems in 1993 and 1994, Dr. Owen's diagnosis of Duran, and Duran's hospitalization in June 1998 for a heart attack support a finding that Duran satisfied a Listing.

Duran is mistaken that the ALJ failed to consider Listing 12.02 in reaching his determination. On the second page of his opinion, Judge Nail states that he "specifically reviewed Sections 5.00, 11.00, 12.02, 12.04 and 12.05." [Tr. at 701.] The Psychiatric Review Technique Form, filled out by Judge Nail on the same day of his decision, provides further confirmation of the ALJ's consideration of 12.02. That Form first documents that Judge Nail determined that there were

symptoms present supporting the existence of 12.02 "Organic Mental Disorders, and that Duran met the "A" criteria of 12.02 because he demonstrated memory impairment, disturbance in mood and reduced intellectual functioning. [Tr. at 709-10.] However, under the "B" criteria, Judge Nail found that Duran had only "slight" restrictions of activities of daily living (without the consideration of alcohol abuse) and "moderate" difficulties in maintaining social functioning. His deficiencies of concentration were evaluated as "often" but not "frequent" or "constant." He "never" had episodes of deterioration or decompensation at work. [Tr. at 711.]

In order to satisfy the 12.02 Listing, Duran had to meet both the "A" and "B" criteria. To meet the "B" criteria, Duran had to demonstrate at least two of the following: (1) a "marked" restriction of activities; (2) "marked" difficulties in maintaining social functioning; (3) "frequent" deficiencies in concentration; or (4) "repeated" episodes of deterioration or decompensation at work. 20 C.F.R. Pt. 404 Subpt. P, App. 1 12.02 (1999). The ALJ concluded that Duran did not satisfy his burden of proof in demonstrating the existence of two of the "B" criteria. Sullivan v. Zebley, 493 U.S. 521, 530, 110 S.Ct. 885 (1990) (applicant bears burden of proof of satisfying requirements of a Listing).

In addition, Dr. Hunter, the medical expert, appears to have considered these same "B" factors at the December 1999 hearing even though he did not specifically mention 12.02. Dr. Hunter testified that he understood Duran "must also meet a degree of limitation under the "B" Criteria. [Tr. at 743.] Dr. Hunter proceeded to testify why he believed, based on the objective medical evidence, Duran failed to meet two marked impairments and/or perhaps even one marked impairment. In any event, Dr. Hunter specifically discussed and concluded that Duran did not meet any Listing. Duran's

attorney questioned Dr. Hunter and never actually addressed 12.02 with Dr. Hunter, even though Duran bore the burden of proof of demonstrating that he satisfied the requirements of a Listing.

Duran's arguments to the contrary do not amount to "overwhelming" evidence sufficient to require reversal of the ALJ's decision. For example, Duran argues that his restriction of activities was "marked" because of prior suicide attempts. However, his most recent ***thoughts*** about suicide in 1996 and 1997 appear complicated by the use of alcohol and linked to the alleged death of his son. [Tr. at 498-99.] Duran does not appear to have ***attempted*** suicide since 1993 or early 1994, and even then he was inconsistent about whether he actually did or did not attempt suicide. [Tr. at 216.] The suicide gesture or attempt in early 1994 seemed to be motivated by a desire to manipulate his girlfriend, who had left him. [Tr. at 367.] In any event, more recent medical records do not indicate any suicide attempts and instead reflect that Duran engages in a wide range of activities. For example, he told rehab staff in Roswell that he was working part time in a shelter cooking in 1998. [Tr. at 873.] At the December 1999 hearing, he testified that he went out to the movies and to eat, spent about ten hours a day drawing and could take care of his personal needs. [Tr. at 734.]

Duran's arguments that he had "marked" difficulties in maintaining social functioning and "repeated" episodes of decompensation also are unconvincing and unsupported. For example, Duran reported in his application for DIB that he had no difficulties in getting along with people. He presently goes to church, AA and NA meetings where he interacts with various people and meets acquaintances in Old Town. Duran also failed to carry his burden of proof in demonstrating "repeated" episodes of decompensation due to his past psychiatric hospitalizations. His psychiatric hospitalizations in 1993 apparently were related to mixing drugs with alcohol and/or to his attempts to manipulate his girlfriend. [Tr. at 191.] In one instance, he presented after a supposed suicide

23

attempt and yet performed "very well" on a mini-mental status examination.  Although he was worried about being in a psychiatric hospital, he stated he did not feel he was "in a fog" or "unable to cope."  Moreover, his psychiatric hospitalizations were infrequent and have not occurred recently.

This case is factually similar to an Eight Circuit decision in Goose v. Apfel, where the Court affirmed the ALJ's finding that the applicant had not met a listed impairment.  Goose, 238 F.3d 981 (8th Cir. 2001.)  In Goose, the SSI applicant had a tenth grade education and spotty work experience. He had a history of substance abuse and mental disorders.  In 1995, he suffered a severe head injury and had heart valve replacement surgery after the injury to correct a congenital defect.  Goose, similar to Duran, was diagnosed with organic mental disorder, personality disorder, substance addiction, disorder and heart ailments.  Id. at 983.

In Goose, the ALJ found that the applicant did not satisfy the Listing requirements under 12.02 because he did not meet the "B" criteria.  For example, the evidence showed that Goose continued to hang out with his friends and play cards daily and that he had little difficulty getting along with others.  While he had some difficulty in concentration and persistence and pace, he could perform simple tasks like making the bed, performing odd jobs and playing cards.  Goose, like Duran, performed quite well in test setting and at evaluations with the Social Security personnel.  Id. at 984. The ALJ properly denied benefits to the applicant.

For all of the reasons stated above, and consistent with the reasoning in Goose, the Court concludes that substantial evidence supported Judge Nail's determination that Duran failed to satisfy a Listing.

### B.    *Pain[14] and Credibility Determinations*

Duran argues that the ALJ's credibility findings were based on "several medical reports" and that Judge Nail improperly used Duran's mental impairments, e.g., exaggeration, deceit, and manipulation, to find him not credible.  [Doc. 11 at 8-9.]  The Court will not discuss at length Duran's extensive medical records, that are summarized above.  However, the objective medical evidence shows that on more than several occasions, Duran lied to medical personnel about his motivation and condition.  Indeed, the medical records, which are carefully and thoroughly addressed by Judge Nail, are replete with examples of Duran's "aversion to telling the truth" and examples of his non-compliance.  A claimant who fails to follow prescribed treatment or fails to cooperate with his doctors can be denied Social Security benefits.  <u>Decker v. Chater</u>, 86 F.3d 953, 955 (10th Cir. 1996).

A brief summary of Duran's liberties with the truth and history of non-compliance confirm Judge Nail's conclusions on credibility.  In November 1993, Duran claimed to commit suicide and then recanted.  In order to be discharged, he lied about his son having been injured.  His girlfriend, according to Dr. Ewing, stated that he had been manipulating the truth to get his way for many years. He later claimed to have tried to commit suicide on two other occasions and then again recanted. Duran actually admitted to Dr. Ewing that he had lied to many people.  Nonetheless, Duran continued to fabricate stories that did not check out.  He also repeatedly told medical personnel conflicting and different dates for when he last took a drink.

---

[14]Duran's subheading in his brief identifies "Pain and Credibility" as issues and yet Duran's attorney never argues that the ALJ made erroneous determinations about Duran's alleged pain.  Therefore, this Court does not address allegations regarding pain, other than to comment that Duran does not appear to allege that any purported pain was disabling.

He was discharged from treatment and hospitals against medical advice on a number of occasions. He improperly used prescriptions drugs. He improperly mixed prescription drugs with Antabuse. He repeatedly failed to show up for therapy and medical appointments. More than one health care provider found him to be manipulative, to exaggerate symptoms or to be feigning mental illness. Judge Nail analyzed and discussed all of these records, as well as others indicating Duran's propensity for fabricating stories and symptoms.

Duran's attorney apparently must admit that Duran "exaggerates," and is deceitful and manipulative, but tries to discount these behaviors by characterizing them as part of his impairment. [Doc. 11 at 9.] The Court does not dispute the definitions of Antisocial Personality Disorder from the DSM-IV, cited by Duran's counsel. However, not one of the treating or examining health care providers concluded, with any certainty, that Duran's tendency to lie was merely part of his illness. Dr. Ewing initially diagnosed Duran as having features of sociopathy and then with "Sociopathic Personality Disorder," but about one month or two later revised this diagnosis. [Tr. at 294, 217, 286.] In other words, after Duran subsequently admitted to Dr. Ewing that he had been lying extensively, Dr. Ewing did not know how to diagnose him. He felt that Duran's fabrications were "too implausible" and "too great" to attribute to a Sociopathic Personality Disorder. The initial diagnosis then appears to have been retracted. Subsequent examinations did not confirm a sociopathic disorder. Instead, other health care providers, just as Dr. Ewing, noted that Duran feigned mental illness.

Duran's counsel also claims that the ALJ's use of one of Dr. Ewing's report was contrary to the evidence and/or a misstatement of the evidence. Duran argues that Dr. Ewing found "in almost every other respect [other than speech and language], [Duran] exhibited signs of mental illness."

[Doc. 11 at 9.] The Ewing record cited by Duran [Tr. at 191], documents that Duran was picked up by the police for an involuntary hospitalization, was willing to come with the police, and was very cooperative upon arrival. Duran denied any history of substance abuse and denied any history of previous psychiatric diagnosis. Dr. Ewing found that he appeared anxious, depressed and "perhaps chronically ill," but that he performed "very well" on a mini-mental status examination. Duran was oriented and missed the exact date by one day. He was "completely oriented to person and place." He remembered details of his personal past. He offered no paranoid or delusional material. While Dr. Ewing was concerned about his safety and fluctuating cooperativeness, this record does not show that Dr. Ewing found "in almost every other respect" that Duran was exhibiting signs of mental illness. Nor is the Court convinced that the May 1994 medical record cited by Duran shows that "any finding that Duran is feigning mental illness should be put to rest." [Doc. 11 at 9.] The record generally confirms that Dr. Ewing again is not certain how to view Duran and his fabrications.

The Court concludes that the ALJ here properly linked his credibility findings to the evidence as required by Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995). This is not a case where the ALJ simply recited the general factors he considered and then drew a conclusion that the claimant was not credible. Judge Nail extensively discussed the specific evidence and connected that evidence to his conclusion.

### C.    *Closed Period of Disability*

Plaintiff's argument that the ALJ should be required to analyze whether Duran "was capable of employment in 1993 and 1994" and therefore, "entitled to a closed period of disability in spite of any later improvements," seems to be an afterthought. It is difficult to know what exact period Plaintiff refers to other than to some point after his August 1993 accident. For example, Plaintiff does

not attempt to define the cessation date for any closed period of benefits. In any event, the ALJ determined that Duran was not disabled "at any time through the date of [the February 8, 2000] decision," and the Court concludes that the ALJ's decision is supported by substantial evidence. Moreover, Duran has not developed this argument in any meaningful way, and it appears to be waived. *See* Buccanero v. Apfel, 221 F.3d 1338 (Table, Text in Westlaw), 2000 WL 989620, No. 99-4042 at *5 (7th Cir. July 14, 2000) (argument that ALJ should have considered applicant for closed period of disability benefits was waived when the applicant failed to meaningfully develop the argument).

### D. *Judge Nail's Consideration of the Case on Three Occasions*

Duran argues that the Hearings, Appeals and Litigation Law Manual is persuasive authority for the propositions that Judge Nail should not have been assigned the second remand of this case and that another ALJ should be assigned if it is remanded again. The Court need not address Duran's second argument since this case is not being remanded again. With respect to the first argument, the provision of the Hearings, Appeals and Litigation Law Manual, cited by Duran, states that the Appeals Council typically will remand a case to the same ALJ unless the "case was previously assigned to that ALJ on a prior remand from the Appeals Council. . . ." There is no "per se" evil in having the same judge consider a matter on remand. Moreover, Duran properly concedes that this Manual is not binding on the Court. Even if it were, however, the cited provision does not address the procedural history of this case because the Appeals Council did not remand this matter for a second time. The Appeals Council reviewed Duran's second request for review and denied the request. After an appeal was pending before the United States District Court, the Commissioner agreed to a (second) remand. Therefore, the cited provision of the Manual is inapplicable to these

28

circumstances, and furthermore, the Court finds no basis to conclude that Duran failed to receive a full and fair hearing before Judge Nail.

### E. *Alcoholism is a Contributing Factor*

In 1996, Congress amended pertinent legislation to read that "[a]n individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addition would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. §§ 423(d)(2)(C), 1382c(a)(3)(J). In other words, the amended law prohibits the award of DIB or SSI to individuals disabled by alcoholism or drug addition. Austin v. Massanari, 162 F. Supp. 2d 517, 526-27 (W.D. La. 2001). The relevant inquiry is "whether [the Commissioner] would still find you disabled if you stopped using drugs or alcohol." 42 U.S.C. §§ 404.1535(b)(1), 416.935(b)(1); Bellamy v. Massanari, ___ F.3d ___, 2002 WL 120532 (10th Cir. Jan. 30, 2002). The ALJ must determine whether the claimant's current physical and mental limitations would remain if he stopped using alcohol and then decide whether any of the remaining limitations would be disabling. Austin, 162 F. Supp. 2d at 526-27.

Judge Nail found that Duran was disabled during the periods of review when he was actively abusing alcohol, but that without consideration of his abuse of alcohol, he retained the RFC to support unskilled, routine work that does not require complex or detailed instructions. [Tr. at 706.] This finding is amply supported by the objective medical evidence. Judge Nail concluded that without consideration of the effects of Duran's alcoholism, he had only slight limitations of his activities. However, because of his reduced IQ (which may have resulted from his alcohol consumption), Duran could only maintain attention and concentration in simple, unskilled work environments. [Tr. at 707.]

The vocational expert concluded that jobs were available nationally and regionally that Duran could perform with his RFC.

Although Duran does not specifically challenge the RFC finding, I conclude that substantial medical evidence supports Judge Nail's RFC determination and the step five finding.

## Recommended Disposition

That Duran's Motion to Reverse and Remand for a Rehearing [Doc. 10] be denied for the reasons stated herein and that this matter be dismissed, with prejudice.

Lorenzo F. Garcia
United States Magistrate Judge